OPINION OF THE COURT
Joseph E. Gubbay, J.
*518 Defendant entered into a conditional plea of guilty whereby he agreed to comply with a period of residential drug treatment. If the defendant complied with treatment, the defendant would receive a sentence of probation. In the alternative, if he failed, he would be sentenced to six years in state prison. Defendant was discharged from residential treatment for allegedly assaulting a coresident in connection with a gang-related initiation rite. This case requires the court to consider the level of due process the defendant is entitled to in determining whether the defendant has failed to comply with the conditions of his plea. The court’s opinion is guided by the United States Court of Appeals, Second Circuit, decision Torres v Berbary (340 F3d 63 [2003]), which sets forth the federal due process parameters in this context. The impact of Torres cannot be minimized given the existence of nine drug treatment courts in New York City alone, and the fact that each of these courts routinely confronts the issue at the heart of Torres: what quantum and character of evidence must a court consider to determine whether a defendant was justifiably discharged by a treatment provider.[1]
Defendant asserts that he is entitled to the broadest hearing, and that due process requires the calling of witnesses and the right to cross-examine. The People oppose, arguing that there is sufficient evidence before the court for it to find that the defendant was justifiably discharged from the treatment program based on the alleged conduct.
Based on the reasoning below, the court concludes that any defendant who disputes the factual basis of termination from a residential treatment program, and where continued treatment is no longer offered by either the court or the People, if imposition of the jail alternative is based solely on this discharge and the underlying facts which led to the discharge, such defendant is entitled to a hearing, if requested, before the jail alternative may be imposed.[2] The court, however, is not bound to convene a hearing of the breadth sought by the defendant in the instant case, so long as there is a preponderance of trustworthy, reli *519 able, and accurate evidence for the court to resolve the disputed facts.
Factual Background
On February 3, 2003, the defendant pleaded guilty to one count of burglary in the second degree (Penal Law § 140.25 [2]), a C felony, and one count of petit larceny (Penal Law § 155.25), an A misdemeanor, in satisfaction of the pending indictment.[3] Defendant admitted that he entered a private dwelling without permission or authority and stole money. Defendant’s plea was predicated on the following conditions: that if he complied with residential drug treatment, his felony plea would be vacated and dismissed and he would be sentenced to a period of three years’ probation on the misdemeanor conviction. Defendant was advised that his plea was conditioned on his “cooperating with [the] residential program” where he would be placed. Defendant was further advised that if he did not complete the program he would be sentenced to a state prison alternative of six years. The defendant indicated that he understood and accepted the terms of the plea (transcript at 5-7). On March 19, 2003, defendant was released from custody and placed in a residential treatment facility, Phoenix House. He remained overall compliant with the treatment mandate until February 15, 2004.
On February 17, 2004, the court was notified by the court-appointed monitor, Treatment Alternatives to Street Crime (TASC), that the defendant was discharged from Phoenix House. In a letter provided to the court dated February 17, 2004, addressed to TASC, the managing director of the Phoenix House facility where the defendant was placed reported,
“On February 15, 2004, Mr. Joseph was identified as being part of a group who took part in a gang initiation ritual. The initiation rite involved physical violence which is grounds for discharge. It was reported that Mr. Joseph is alleged to be a member of the, ‘Crypts’ [sic] and one of the individuals] who carried out the initiation. Consequently, he was discharged from Phoenix Academy.”
On February 18, 2004, the defendant, with counsel present, appeared in court and was remanded. The case was calendared *520 for the following day for the People to provide the court with more facts.
On February 19, 2004, the defendant was present and represented by counsel. The People, based on discussions with TASC and staff from the facility where the incident occurred, related that on the date of the incident the defendant was in the program’s auditorium rehearsing for a cultural event. The auditorium is located on the first floor of the facility. The assault took place on the floor below the auditorium. Defendant was seen in the auditorium between the hours of 7:00 p.m. and 11:00 p.m. by a staff member whose name was provided in open court. The incident occurred between the hours of 8:00 p.m. and 9:00 p.m. The People described the rehearsal as a “fluid situation” where skits were rehearsed and “people would come and go.” The People added that the victims of the assault were also members of the identified gang, but not members of the “local chapter.” The defendant was known to the victim by his street name identified in court. He lived in the same unit in the facility as the victim. The two victims were beaten one at a time. The People had spoken with the named individual who conducted the investigation (the program’s deputy director for adolescents), who had interviewed both victims. The victims named the defendant as one of the initiators and named him by his street name. A corporeal identification proceeding ensued and the defendant was identified. (Transcript at 2-6.)
The defendant was given an opportunity to make a sworn statement to the court. He denied his participation in the gang initiation and stated that during the assault he was participating in another activity at the facility and that this could be verified by the same staff member identified by the People. (Transcript at 7-10.) The defendant never denied his gang affiliation or the street name by which he was known.
In response to the defendant’s statement, the People cited a second letter, submitted to the court and dated February 19, 2004, addressed to TASC, written by the managing director of the facility,
“This letter serves as a follow up to our review of Mr. Joseph’s reported involvement in the gang initiation ritual that took place here on February 15, 2004. Mr. Joseph insisted that, at the time of the beating, he was participating in a community activity. He adds that the activity was overseen by a facility staff member. When asked to corroborate Mr. *521 Joseph’s alibi, the staff member stated that Mr. Joseph was seen at the activity but she could not account for his presence for the full period. Nevertheless, Mr. Joseph was identified as one of the gang initiators by the two victims.”
In a letter dated March 16, 2004, written to TASC, the vice-president and deputy regional director for the program advocated for the defendant’s reinstatement to the program given the defendant’s repeated petitions to return, and the director’s belief in the defendant’s commitment to treatment. This endorsement was based on the defendant’s compliance with a call-in schedule set by the director, and because in the director’s own words, “He also seems genuine in renouncing gang affiliation and helping the Phoenix community deal with the gang issue.”
On May 13, 2004, after meeting with the People and counsel for defendant, the court corresponded with the facility’s managing director seeking more specific facts concerning the incident, including the identities of the victims and any witnesses, as well as the details of their personal observations.[4] A response was received dated June 7, 2004. It states in relevant part,
“As you requested, I conducted a thorough review of Mr. Pierre Joseph’s discharge from the Phoenix Academy. The discharge was based on reports from two residents one of whom identifies Mr. Joseph as his attacker in what was later described as an [szc] gang initiation ritual. The reporting resident stated that he had no desire to be gang initiated. Adding, he proceeded to the area where the incident took place believing that a legitimate facility function was happening. At the time of this incident, both of the residents were relatively new to the program and believed they were following the directions of responsible peers.”
The letter continues to describe the same alibi offered by the defendant and concludes, “Mr. Joseph was observed by a staff member participating in the rehearsal but, could not account for his presence during the entire activity.”
*522 Despite the court’s request for in camera review, the identities of the witnesses were not revealed.[5]
Insofar as the program’s reply was not fully responsive, a follow-up request for further information, dated June 21, 2004, was made on the court’s behalf by the citywide drug treatment court coordinator to the Phoenix House assistant general counsel. A response dated June 30, 2004 was received from the director of clinical services. The response identified, by full name, the two staff members who investigated the incident. Further, the two victims were named by first name and last initial. Unredacted copies were provided to the People and the defendant. The letter states in pertinent part,
“The victims [first name, last initial of both victims in original], were interviewed separately by [names of both investigators in original] respectively on the day of the incident.
“On the day of the incident, [victim No. 2] first identified Mr. Pierre Joseph from a list of suspects and then identified him in person. [Victim No. 2] stated th[at] he was a former Crips and wanted to disaffiliate himself. He adds that for several weeks he was being pressured to renew his participation. He proposed the reason for his attack was based on his position not to be gang affiliated.
“Both victims sustained injuries but, neither required medical attention. Both interviewing counselors observed the following injuries: [victim No. 1] had scratches on his neck and upper body, and [victim No. 2] had facial and neck bruises and was given an ice pack for the facial swelling. No photographs were taken of the victims. Neither victim wished to press charges so a police report was not filed.
“The incident was reported to the appropriate criminal justice agencies on the day of the incident. Upon conclusion of the staffs investigation, two days after the incident occurred, it was decided that all clients identified as attackers were to be discharged.”

Torres v Berbary

In Torres v Berbary (340 F3d 63 [2d Cir 2003]), defendant sought habeas relief in the United States Court of Appeals for *523 the Second Circuit. The Torres court held that the trial court erred in relying on a single written report, which the Court of Appeals found to be fundamentally untrustworthy, in determining that the defendant had violated the plea agreement and was subject to the prison alternative. The Torres court ruled that federal due process in sentencing “requires at least a showing by a preponderance of evidence to resolve disputed factual issues,” a standard not afforded by the trial court (id. at 71).
Due process is implicated in sentencing because a defendant’s right to enforce his plea agreement is a Fourteenth Amendment liberty interest (US Const 14th Amend; see, People v Outley, 80 NY2d 702, 712 [1993]; Lopez v Sanders, 302 F Supp 2d 241, 246 [SD NY 2004]). “[A]s a matter of due process, an offender may not be sentenced on the basis of ‘materially untrue’ assumptions or ‘misinformation’ ” (People v Naranjo, 89 NY2d 1047, 1049 [1997], quoting United States v Pugliese, 805 F2d 1117, 1123 [2d Cir 1986], quoting Townsend v Burke, 334 US 736, 741 [1948]). “Rather, ‘[t]o comply with due process . . . the sentencing court must assure itself that the information upon which it bases the sentence is reliable and accurate’ ” (People v Naranjo, at 1049, quoting People v Outley, 80 NY2d 702, 712 [1993]).
Torres involved a defendant who was allowed to enter drug treatment after pleading guilty to criminal sale of a controlled substance in the third degree, a B felony. Less than a month after his placement, the defendant was discharged from the program for his involvement in a plan to sell drugs at the treatment facility and his participation in gang meetings. In determining that the defendant’s discharge was justified, the trial court relied exclusively upon a single report from the program. The report contained references to overheard conversations in Spanish between the defendant and other residents. There was no physical evidence connecting the defendant to the alleged drug sales, and the only evidence directly implicating him were allegations that he had engaged in the use of gang-related hand signals. The sources of the information were unnamed informants. There was no evidence of corroboration within the body of the report, nor was any subsequently provided. On the basis of this report, and despite the defendant’s request for “some sort of hearing, evidentiary hearing on this issue,” the trial court determined that defendant breached a condition of his plea and sentenced him to 41/2 to 9 years (Torres, 340 F3d at 66).
In overturning the sentence, the Court of Appeals examined the report upon which the trial court based its determination. It *524 noted that double and triple hearsay informed the decision of the treatment provider to discharge Torres from the program. The Court of Appeals was specifically concerned about the speculative nature of the accusations leveled at Torres, which did not specifically implicate him in any way with respect to the drug sales (Torres, 340 F3d at 70). The Torres court observed,
“In the first place, it cannot be said that the required preponderance of the evidence standard in sentencing can be met with only a report of the type furnished by Phoenix House. As has been demonstrated, due process in sentencing requires at least a showing by a preponderance of evidence to resolve disputed factual issues. While it is true, as the learned district judge noted, that Morrissey v. Brewer permitted the use of ‘material that would not be admissible in an adversary criminal trial,’ 408 U.S. at 489, 92 S.Ct. 2593, a single report replete with multiple levels of hearsay and speculation cannot be said to suffice to make a showing by a preponderance of the evidence, even under the ‘flexible’ standard that is permitted.” (Id. at 71.)[6]
In Torres, the court stated that the standard of proof to resolve disputed facts in sentencing is a preponderance of the evidence. It did not, however, hold that this standard can only be met by holding an evidentiary hearing which includes the calling of witnesses subject to cross-examination. Rather, so long as the court is provided with sufficient information which it determines is reliable and trustworthy, and that evidence reaches the threshold of a preponderance to resolve the disputed facts, then due process has been satisfied. A defendant’s compliance with the condition that he successfully complete a drug treatment program “can be readily established based upon factual information provided to the court. . . provided that the court has assured itself that the factual information justifying its departure from the negotiated sentence is reliable and accurate” (People v Parker, 271 AD2d 63, 69 [4th Dept 2000]).
The Torres court set forth five elements, “unique” to the case, which compelled it to grant the writ of habeas corpus:
*525 “[1] total reliance by the trial court on a hearsay report that itself contains only uncorroborated statements of unnamed informants; [2] omission of any finding by the trial court as to the reliability of the informants or as to reasons for the non-disclosure of their identities; [3] failure of the trial court to conduct some kind of hearing, including provision for the examination of Torres under oath; [4] lack of preponderating evidence of Torres’ wrongdoing; and [5] the gross disparity between a sentence that would release Torres to society on a plea to a misdemeanor charge after completion of the Phoenix House program and the four-and-a-half-to-nine-year felony sentence to state prison that he received for violating the original sentence condition” (Torres, 340 F3d at 72).
Findings of Fact and Law
In the instant case the initial information received from the treatment provider regarding defendant’s discharge was conclusory and uncorroborated. This court, guided by Torres, insisted that the treatment provider provide it with as many facts as possible, including the identities of the witnesses and investigators, the nature of the injuries and the defendant’s role in inflicting those injuries, as well as any evidence which could corroborate the allegations. The evidence ultimately presented to the court, taken in its entirety, satisfies the due process requirements set forth in Torres.
It is a sad and unfortunate reality that many defendants in residential treatment are unable to comply with the strict mandates required of living in a therapeutic community. It is not an uncommon occurrence for such defendants to be discharged by the facility. After an evaluation of the circumstances of discharge, in many cases, defendants are given a second chance either at the original program or in a new placement. It is a probability that the defendant’s initial discharge is considered prejudicial, and that should he be given a second chance, it is in all likelihood his last chance.
To require a full blown evidentiary hearing each time a defendant is discharged from a residential treatment program would place an undue and onerous burden on the court. If such a hearing was convened, how broad should the inquiry reach? Would residents be required to testify? If so, the court would have to take precautions to protect their identities in compliance with federal confidentiality requirements, and in certain circum *526 stances, it may have to provide them with counsel.[7] Will treatment counselors have to testify, disrupting the provision of services to others in need, in order to travel, frequently from outlying jurisdictions? Further, the amount of the court’s time that would be consumed by such litigation would have a debilitating effect on its ability to adequately and efficiently hear all the cases on its already congested docket.
Each of the five elements outlined by the Torres court, as set forth above, is satisfied in the instant case.
(1) Reliance on Hearsay Reports
Rather than relying on a single report which contains uncorroborated statements of unnamed informants, this court has considered the oral report of the People based on their interview of one of the investigating Phoenix House staff members as well as four separate written reports, the last of which, dated June 30, 2004, provided the names of the staff members who investigated the incident and described how the incident was brought to their attention. Further, it identified the names of the victims who were involved in the incident, the nature of the injuries they sustained, and the fact that these injuries were observed and thus corroborated by staff members. It also indicated that on the day of the incident one of the victims identified the defendant from a list of suspects and then identified him in person as one of the perpetrators of the attack.
Significantly, the Torres court had serious concerns whether there was a reliable basis for the treatment provider to have discharged Torres in that his discharge was based on double and triple hearsay. (See, Torres, 340 F3d at 70.) In the instant case, a much more thorough internal investigation was conducted by Phoenix House. Each victim was interviewed separately on the date of the incident, and on that same date the defendant was identified as the perpetrator. The victims’ visible injuries were treated and the defendant was confronted. The alibi which the defendant offered was investigated and found to be unconvincing. Based on the information of eyewitnesses, Phoenix House determined that discharge was appropriate.
(2) The Reliability of the Informants and the Disclosure of Their Identities
Given the specificity of the details provided about the gang initiation, the injuries sustained by the victims which were veri *527 fied by Phoenix House staff, and the victims’ candid statements against penal interest as to their one time gang affiliation, the court finds that the informants are rehable. With respect to the identity of the informants, defendant was provided the names of the Phoenix House staff investigators and the defendant was identified as the perpetrator by one of the victims in a face-to-face encounter and thus is aware of his accuser’s identity.
(3) Defendant Was Given a Hearing of Sufficient Breadth
As stated above, the court finds that when a defendant is discharged from a residential program and replacement in treatment is no longer being offered by either the People or the court, if imposition of the jail alternative is based solely on this discharge and the underlying facts which led to the discharge, then before the jail alternative may be imposed, if requested, a defendant is entitled to a hearing.[8] Such hearing doés not necessarily require the calling of witnesses or an opportunity for the defendant to cross-examine. Rather, so long as the criteria of Torres and Outley are complied with, that there is sufficient reliable, trustworthy, and accurate evidence for the court to determine whether discharge was justified, based upon a preponderance of the evidence, due process is satisfied.
The court carefully reviewed the record in its entirety and the defendant was given an opportunity to provide sworn testimony. The court’s review and detailed summary of the record in open court, the opportunity given to the defendant to provide sworn testimony, and the opportunity given for the defendant and his counsel to dispute the People’s representations as well as the court’s analysis of the record, constitute a hearing of sufficient breadth to satisfy the due process requirements of Torres and are consistent with the New York State Court of Appeals holding in Outley.
(4) Defendant Engaged in Alleged Wrongdoing Based on a Preponderance of the Evidence
“The burden of showing something by a ‘preponderance of the evidence,’ . . . simply requires the trier of fact ‘to believe that the existence of a fact is more probable than its nonexistence’ ” (Concrete Pipe & Prods. of Cal., Inc. v Construction Laborers Pension Trust for S. Cal., 508 US 602, 622 [1993], quoting In re Winship, 397 US 358, 371-372 [1970]). The court finds that the information provided by Phoenix House, includ *528 ing the reports of the investigators and victims and the narrative of facts recited by the People, is reliable, trustworthy and accurate. The defendant’s sworn testimony was considered and found not to be persuasive. A preponderance of the evidence plainly supports the charge that the defendant assaulted two coresidents in furtherance of a gang initiation rite.
(5) Disparity in Sentence
When the defendant pleaded guilty to a violent felony, burglary in the second degree, he accepted a weighty bargain: comply with treatment and be sentenced to three years’ probation or fail and be sentenced to six years in state prison. Typically this is the model followed in most felony drug treatment courts, liberty if one succeeds and extended state prison if one fails. The theory underlying the model is that a lengthy jail alternative has a coercive effect to ensure compliance with drug treatment. While it is true Phoenix House has offered to readmit the defendant, the People are not willing to reoffer treatment based upon the circumstances of his discharge. Their position is that an individual who furthers gang activity, activity which has a lethal hold on some of Brooklyn’s poorest and most vulnerable communities, is not deserving of a second chance at treatment. The court agrees. Insofar as the defendant has been afforded a hearing consistent with due process, sentencing may proceed.

. In Kings County there are three drug treatment courts: Brooklyn Treatment Court, the Screening Treatment and Enhancement Part, and Misdemeanor Brooklyn Treatment Court; in Manhattan there are two such courts: Manhattan Treatment Court and Manhattan Misdemeanor Treatment Court; in Queens there are two drug treatment courts: the Queens Treatment Court and the Queens Misdemeanor Treatment Court; the Bronx and Staten Island each have a treatment court: the Bronx Treatment Court and the Staten Island Treatment Court, respectively.

. The court’s holding does not contemplate the case of a defendant who is discharged based on conduct which resulted in an arrest. In that event, the *519 New York Court of Appeals decision in People v Outley (80 NY2d 702 [1993]) would control.

. The indictment charged the defendant and his codefendant with nine counts, including three separate counts of burglary in the second degree. Defendant pleaded guilty to one of these counts.

. The instant court was assigned to the case in April 2004.

. To comply with federal regulations, the program would not disclose the full names of the victims. (See, 42 USC § 290dd-2; 42 CFR part 2.)

. The “flexible” standard cited by the court refers to the United States Supreme Court decision in Morrissey v Brewer, which set forth the due process requirements in the context of a parole revocation proceeding, “the process should be flexible enough to consider evidence, including letters, affidavits, and other material that would not be admissible in an adversary criminal trial” (Morrissey v Brewer, 408 US 471, 489 [1972]).

. 42 USC § 290dd-2.

. The court’s holding incorporates the qualification set forth in footnote 2 above.