NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

ROBERT JOEL MOLLICA II,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-13046
Trial Court No. 3AN-11-04977 CR

O P I N I O N

No. 2711 — October 22, 2021

Appeal from the Superior Court, Third Judicial District, Anchorage, Kari Kristiansen, Judge.

Appearances: Emily Jura, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for the Appellant. Terisia K. Chleborad, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge ALLARD.

Robert Joel Mollica II was discharged from the Palmer Wellness Court after he committed a domestic violence assault against his girlfriend, and then, shortly after being released from jail for the assault, absconded from his housing program, used illegal

drugs, and attempted to break into the Anchorage Police Department, resulting in a new criminal charge of criminal trespass.

On appeal, Mollica does not dispute that he committed these actions; nor does he necessarily dispute that they constitute good cause for his discharge from Wellness Court. Instead, he argues only that the procedures by which he was discharged from Wellness Court violated due process because, according to Mollica, he was not given "notice or the opportunity to respond" to the reasons for his discharge.

We have not previously addressed the due process rights of a criminal defendant facing discharge from a post-plea therapeutic court program. In accordance with the majority of other jurisdictions that have considered this question, we now hold that a defendant facing discharge from a post-plea therapeutic court program has due process rights akin to the limited due process rights of parolees and probationers facing revocation of their parole or probation. These rights include the right to written notice of the grounds for discharge, disclosure of the evidence against the participant, and an opportunity to challenge that evidence and offer any defenses or mitigating information.

Here, the record is clear that Mollica was on notice of the grounds for his discharge and that he was given an opportunity to be heard. The record is also clear that Mollica never raised any objections to the procedures used to discharge him and he did not dispute the factual grounds for discharge. Given these circumstances, we conclude that reversal of the superior court's order discharging Mollica from Wellness Court is not required.

Mollica also challenges the sentence that was imposed for his probation violation. For the reasons explained here, we affirm the sentence as not clearly mistaken.

*Background facts and prior proceedings*

In 2013, Mollica pleaded guilty, pursuant to a plea agreement, to second-degree robbery following an incident in which he stole items from an Anchorage Fred Meyer store and threatened a security guard with a long, fixed-blade knife.[1] Mollica also pleaded guilty, under the agreement, to violating the conditions of his release because he failed to attend a pretrial hearing.[2] The superior court sentenced Mollica to 10 years with 5 years suspended (5 years to serve) and a 5-year term of probation for these crimes.

In 2015, after Mollica was released from custody and began serving his probation, the State filed a petition to revoke Mollica's probation based on an incident in which he kicked in the door of an occupied residence in Anchorage. The State later amended the petition to include additional allegations of illegal drug use. The superior court revoked Mollica's probation for these violations and imposed 60 days of Mollica's suspended time to serve. Mollica then returned to probation.

In 2016, the State filed a second petition to revoke Mollica's probation based on an incident in which Mollica broke into an unoccupied child care center in Palmer with a bloody knife and syringes. As a result of this conduct, Mollica was also separately charged in a new criminal case with second-degree burglary and third-degree criminal mischief.[3]

The parties later agreed to resolve these two matters — the second petition to revoke probation in the Anchorage case and the new burglary charge in the Palmer case — through a Criminal Rule 11 plea agreement. The agreement required Mollica to

---

[1]   AS 11.41.510(a)(1).

[2]   AS 11.56.757(b)(1).

[3]   AS 11.46.310 and AS 11.46.482(a)(1), respectively.

enter and complete the Palmer Wellness Court. The Palmer Wellness Court is a therapeutic court that is focused on substance abuse treatment.[4]

As part of his Wellness Court agreement, Mollica agreed to admit the second probation violation in the Anchorage case. If Mollica successfully completed Wellness Court, the second petition to revoke probation would be dismissed, and Mollica's probation would be terminated. However, if Mollica was discharged from Wellness Court prior to completing the program, the petition would proceed to the disposition stage, and the superior court would sentence Mollica on the probation violation.

In addition, as part of the agreement, Mollica agreed to plead guilty to third-degree criminal mischief in the Palmer case and to receive a 30-month suspended sentence.[5] This sentence would remain suspended if Mollica completed the Wellness Court program, but 30 months would be imposed as time to serve if Mollica was discharged from the program.

---

[4] *See* Alaska Court System, PUB-118, *Alaska Therapeutic Courts: Palmer Wellness Court* (2019), *https://public.courts.alaska.gov/web/forms/docs/pub-118.pdf* (describing Palmer Wellness Court). As a general matter, therapeutic courts — variably known as drug courts, support courts, and wellness courts — bring justice system players together to support the treatment and rehabilitation of participants. Parties involved typically include a judge, prosecutor, defense attorney, and probation officer. Other community service providers and law enforcement officials may also participate. To facilitate this collaboration, "the prosecutor and defense counsel must shed their traditional adversarial courtroom relationship and work together as a team." National Association of Drug Court Professionals, Drug Court Standards Committee, *Defining Drug Courts: The Key Components* 3 (2004 reprinting).

[5] AS 11.46.482(a)(1).

*The terms and conditions of Mollica's Wellness Court participation*

As part of the Wellness Court program, Mollica was required to attend therapeutic court proceedings, follow an individualized treatment plan, take and pass regular alcohol and drug screenings, report contacts with law enforcement and changes in address or employment to his probation officer, "eliminate problems contributing to addiction," and "make suitable progress towards controlling addiction."

A therapeutic court team oversaw Mollica's participation in Wellness Court. The team included the therapeutic court judge, the prosecutor, Mollica's defense attorney, and a probation officer/case manager. The team met prior to regularly scheduled court status hearings to review and discuss the progress of Mollica and other Wellness Court participants. The participants were not permitted to be present. As part of his agreement, Mollica was required to waive any right to attend these meetings. However, Mollica and the other participants in the program attended the regularly scheduled status hearings.

Under the agreement, "[s]anctions w[ould] be discussed by the [therapeutic court] team" and would "not necessarily be placed on the record." The agreement further stated, "Ultimately, the therapeutic court judge will decide if specific sanctions will be imposed. The final decisions about the imposition of sanctions are in the Court's sole discretion. The participant has no right to appeal the Court's decisions."

A nearly identical provision applied to the decision to discharge a participant from the Wellness Court. According to the agreement, "[t]he decision regarding a participant's discharge will be discussed by the team" and "[t]hese discussions will not necessarily be placed on the record." In the end, however, "the therapeutic court judge will decide if a defendant is discharged from the program" and "[t]he final decisions about discharge are in the Court's sole discretion" and cannot be appealed by a participant.

The Rule 11 plea agreement further set forth the circumstances under which a participant could be discharged from Wellness Court. The agreement provided that discharge from the program *may* occur if:

> progressive sanctions have previously been ordered and treatment adjustments have been made, but the therapeutic court judge concludes that the participant:
>
> > (i) will not be able to complete the program within two years;
> >
> > (ii) is consistently undermining the progress of others in the therapeutic court program;
> >
> > (iii) has stalked, threatened, assaulted or otherwise harassed other therapeutic court participants;
> >
> > (iv) falsified alcohol or drug test samples or results or falsely reported attendance at program meetings;
> >
> > (v) provides excessive positive, diluted, or missed drug test samples; or,
> >
> > (vi) will not be able to make regular progress in the therapeutic court program because the participant requires resources or services that the therapeutic court program cannot provide.

The agreement provided that the participant *will* be discharged from Wellness Court upon any of the following circumstances:

> > (i) Conviction of a crime involving distribution of drugs.
> >
> > (ii) Conviction of a DUI, any felony offense or any misdemeanor under AS 11.41, with the exception of reckless endangerment, second degree custodial interference or indecent exposure.

(iii) Use of a false identity that has concealed a criminal history which would disqualify the participant from admission to the program; or

(iv) Six positive, missed, diluted, tampered or falsified alcohol or drug tests after admission to the therapeutic court program. However, for ANY positive, missed, diluted, tampered, or falsified alcohol or drug test, the therapeutic court team will seriously evaluate whether the participant's continued participation in the program will be permitted.

(v) Upon a judicial finding of a preponderance of the evidence, that the participant drove any motor vehicle (as defined in AS 28.90-.990(a)(16)) when ordered not to do so.

Although the agreement specified that a participant "will" be discharged if any of the listed circumstances occurred, the agreement had a savings clause that provided discretion to not discharge a participant: "The Therapeutic Court Team reserves the right to review each situation requiring discharge from the program on a case-by-case basis. Upon unanimous agreement of the team, an individual may be conditionally reinstated in the program."

*Mollica's performance in Wellness Court*

Mollica entered the Palmer Wellness Court in June 2017. Two months later, Mollica was arrested for assaulting his girlfriend. Mollica pleaded guilty to fourth-degree assault in 3PA-17-01372 CR and received a sentence of 30 days to serve.[6]

---

[6] AS 11.41.230(a)(1).

Because Mollica was convicted of a misdemeanor crime under AS 11.41 (crimes against a person), he could have been discharged from the program under the provision that stated "[t]he participant will be discharged from the [Wellness] Court Program upon . . . [c]onviction of . . . any misdemeanor under AS 11.41, with the exception of reckless endangerment, second-degree custodial interference or indecent exposure."

However, the therapeutic court team exercised its discretion to conditionally reinstate Mollica in the program with additional restrictions, including additional treatment, a curfew, and a no-contact order with the assault victim. At a Wellness Court hearing on September 7, 2017, Mollica expressed his gratitude to the court for allowing him to remain in the program.

On September 11, Mollica was released from custody for the assault on his girlfriend, and he entered transitional housing for substance abuse treatment.

Three days later, on September 14, Mollica had a regularly scheduled Wellness Court hearing. After checking in with the court, Mollica acknowledged that he had been "butting heads" with people in treatment. The court reminded Mollica that "things are evaluated on a weekly basis," that it was a "tight operation at this point," and that Mollica had "a lot at stake," including several years hanging over his head.

The court then discussed an incident that occurred on Mollica's first day at the housing program, September 11. Mollica admitted to going to collect his car, phone, and clothing instead of going straight to the housing unit, where a staff member was waiting to check him in. The court sanctioned Mollica with six hours of community work service to impress upon him the importance of following the program's rules. Mollica said that he would complete the community work service, and that the court would see improvement by the following week.

The prosecutor also noted on the record that, as far as the State was concerned, Mollica had already "used his one chance" when he was not discharged for the August assault. The prosecutor stressed that Mollica needed to follow through on his promises to work harder.

After being sanctioned at the hearing, Mollica did not return to his transitional housing program as required. Instead, he absconded from the program and did not attend his required therapeutic meetings. The next day, Mollica drove his car (a violation of Wellness Court rules) and abandoned his vehicle in the middle of Tudor Road in Anchorage. Mollica was subsequently arrested and charged with criminal trespass in a new case (3AN-17-07513 CR) after he attempted to enter the Anchorage Police Department unlawfully.[7] Mollica admitted to being under the influence of drugs during this incident.

In response to the new incident, the State filed a third petition to revoke Mollica's probation in the Anchorage robbery case (3AN-11-04977 CR). The petition alleged that Mollica had violated the conditions of his probation by committing a new offense, criminal trespass.

The State also filed a motion for Mollica's immediate remand to custody, alleging that Mollica had violated the conditions of release set by the Palmer Wellness Court. The motion was supported by an affidavit that described Mollica's conduct on September 14 and 15 — namely, that Mollica had absconded from his housing program, failed to attend therapeutic meetings, driven and abandoned his car in the middle of the road, and been arrested for a new crime, criminal trespass.

On September 18, a hearing was held on the third petition to revoke probation in the Anchorage robbery case. At the hearing, Mollica admitted that he had

---

[7]    Anchorage Municipal Code 08.45.010(A)(3)(a).

violated his probation by "committing the offense of criminal trespass," and the court imposed 10 days of his suspended time.[8]

The Palmer Wellness Court held a regularly scheduled meeting that same week. Although Mollica's attorney was present, Mollica was not because he was still in custody in Anchorage. The court delayed "sentencing" and "imposing the Rule 11" until the following week.

Mollica was present at the next hearing on September 28. The hearing began with the court asking Mollica how he was doing. Mollica indicated that he "could be better," and the court acknowledged that "this is not a happy day for me either." The court noted that they had been "trying to figure out ways to avoid where we are today" and "it's a sad day for me to have to see where we're at." The court then explained that the problem was not just the "lack of participation, sort of running away from the entire thing" but that it was the criminal conduct on top of the lack of participation "that makes it really tough to keep you back in the program."

Mollica acknowledged he had struggled to stay sober, but he requested that he be allowed to continue in Wellness Court and do residential treatment. Mollica admitted that he had used drugs, and he stated that he had not returned to his housing because he did not want to jeopardize the sobriety of the other participants. He also stated that he went to the police department in order to turn himself in. Mollica did not otherwise dispute the allegations in the State's petition to revoke probation and motion for immediate remand.

Mollica's defense attorney also requested that Mollica be allowed to stay in the program. She acknowledged that Mollica had "really messed up" and that the rest

---

[8] According to CourtView, Mollica ultimately pleaded guilty to the separate charge of criminal trespass on October 19, 2017.

of the therapeutic court team believed discharge was appropriate. But she argued that Mollica should be allowed to stay so that he could undertake residential treatment.

After listening to Mollica and his defense attorney, the court decided that it would not make a final decision that day. Instead, it would discuss the matter further with the therapeutic court team. The court indicated that it intended to review what Mollica had been doing "over the last month or so" and was particularly concerned about community safety in light of his new criminal conduct.

At the end of the hearing, another Wellness Court participant spoke on Mollica's behalf, stating that when Mollica was sober he was a "stand-up person." The participant stated that Mollica had been instrumental in helping him engage in the program.

The next hearing was held a week later, on October 5. At the hearing, the court indicated that it had met with the treatment team and considered their recommendations. The court asked if anyone had any additional statements to make before the court made its final decision. Mollica's defense counsel restated her position that Mollica should be allowed to remain in Wellness Court. The court then asked Mollica directly if there was anything further that he wanted the court to know. Mollica did not have anything to say about the imminent decision regarding discharge. However, he did ask the court to recommend to the Department of Corrections that he be admitted to the Residential Substance Abuse Treatment program once he was incarcerated.

The court then made its final decision, noting that it had taken several weeks to come to this decision and it did not come to it "lightly." The court noted that, at times, Mollica had done well, but found that, overall, Mollica had done "extremely poorly" in the approximately three months he had participated in Wellness Court. The court further found that when Mollica used drugs, he became violent and unpredictable. The court noted that, on September 14, Mollica had been specifically told to go directly

to his housing unit, not to drive, and to attend all of his appointments. But he "blew all that off." The court indicated that the pertinent question was whether the program could meet his needs, and his recent behavior showed that the program was not working for him.

The court also explained that it was "extremely concerned" about how Mollica's conduct impacted other treatment participants. The court referred to an incident, not previously discussed on the record, in which Mollica had apparently brought an intoxicated woman to treatment.

The court also referred to the August assault, noting the seriousness of the assault and how relatively recent it was. The court cited to an incident, also not previously discussed on the record, in which the probation officer heard a recorded phone call between Mollica and his girlfriend (the victim of the assault). In this phone call, Mollica attempted to pressure his girlfriend into writing a letter of support for him when she did not want to.

Ultimately, the court concluded that Mollica should be discharged based on two different provisions in the Wellness Court agreement — (ii) "[the participant] is consistently undermining the progress of others in the therapeutic court program" and (vi) "[the participant] will not be able to make regular progress in the therapeutic court program because the participant requires resources or services that the therapeutic court program cannot provide." However, the court indicated that it would make the recommendation for the Residential Substance Abuse Treatment program that Mollica had requested.

Following his discharge from Wellness Court, Mollica was sentenced to 30 months to serve in the Palmer case in accordance with his Rule 11 agreement. At a later disposition hearing on the second petition to revoke probation in the Anchorage robbery

case, the court terminated Mollica's probation and imposed 3 years of his remaining suspended time.

This appeal followed.

*A preliminary note regarding Mollica's right to pursue this appeal*

As previously mentioned, in order to join Palmer Wellness Court, Mollica was required to sign a Criminal Rule 11 agreement that detailed the terms and conditions of his participation in the therapeutic court.  As part of this agreement, Mollica agreed that the final decision about discharge would rest in the sole discretion of the therapeutic court judge, and he would have no right to appeal the judge's decision.

In his opening brief, Mollica argues that this waiver of his future appellate rights was invalid and against public policy.  In response, the State claims that the waiver was valid.  But the State also contends that the waiver did not apply to a circumstance such as the one presented here, where the defendant is not challenging the substance of the therapeutic court's decision but instead is bringing a due process challenge to the procedures that led to that decision.

Because the parties agree that any waiver of Mollica's appellate rights does not apply to this appeal, we do not address the validity of Mollica's waiver or his public policy arguments against such waivers.

*Mollica's due process challenges to the procedures by which he was discharged from the Palmer Wellness Court*

Both the Alaska and United States Constitutions guarantee the right to due process.[9]  Due process entitles individuals to a "meaningful and fundamentally fair"

---

[9]    U.S. Const. amend. XIV, § 1; Alaska Const. art. I, § 7.

process when their liberty or property interest is at stake.[10] What process is required and whether due process has been met is a question of law that we review *de novo*.[11]

Mollica asserts that the proceedings that resulted in his discharge from Wellness Court violated two facets of his due process rights: the right to adequate notice of the allegations against him and the right to a meaningful hearing where he could contest the allegations and offer a defense or a mitigating explanation.[12] In response, the State argues that the procedures provided to Mollica were sufficient to satisfy due process. The State also asserts that instituting overly formalized or adversarial proceedings in therapeutic court would harm the efficacy of such courts.

We begin our analysis by noting that there is little appellate case law in Alaska addressing the due process rights of criminal defendants who participate in a post-plea therapeutic court program such as the Palmer Wellness Court. However, a significant body of law has developed in other jurisdictions.

The general consensus among courts that have grappled with these issues is that therapeutic court participants facing termination are entitled to due process rights akin to those afforded to parolees and probationers.[13] Thus, when defining the due

---

[10]   *See Champion v. Dep't of Pub. Safety*, 721 P.2d 131, 133 (Alaska 1986).

[11]   *D.M. v. State, Div. of Fam. & Youth Servs.*, 995 P.2d 205, 207 (Alaska 2000).

[12]   *See Powell v. State*, 460 P.3d 787, 793 (Alaska App. 2020) ("Due process requires that there be adequate notice to the interested parties of the pendency of the action and the opportunity for the interested parties to be heard.").

[13]   *See, e.g., State v. Shambley*, 795 N.W.2d 884, 894 (Neb. 2011) (noting that "[t]he majority of other courts considering the issue have determined that participants facing termination from post-plea diversion programs, such as the drug court program, are entitled to the same due process protections as persons facing termination of parole or probation"); *see also Gaither v. State*, 296 So. 3d 553 (Fla. App. 2020); *State v. Rogers*, 170 P.3d 881

(continued...)

process rights of therapeutic court participants, courts have frequently turned for guidance to *Morrissey v. Brewer* and *Gagnon v. Scarpelli*, the United States Supreme Court's seminal cases governing the due process rights of parolees and probationers in revocation proceedings.[14] We do the same here.

In *Morrissey v. Brewer*, the United States Supreme Court held that due process attaches to parolees in parole revocation proceedings, despite the conditional nature of a parolee's liberty interest and the fact that parole revocation occurs after the end of the criminal prosecution.[15] The Court came to the same conclusion regarding probation revocation proceedings in *Gagnon v. Scarpelli*.[16] As the Court explained:

> Both the probationer or parolee and the State have interests in the accurate finding of fact and the informed use of discretion — the probationer or parolee to insure that his liberty is not unjustifiably taken away and the State to make certain that it is neither unnecessarily interrupting a

---

[13]  (...continued)
(Idaho 2007); *People v. Anderson*, 833 N.E.2d 390 (Ill. App. 2005); *Gosha v. State*, 931 N.E.2d 432 (Ind. App. 2010); *State v. Brookman*, 190 A.3d 282 (Md. 2018); *People v. Joseph*, 785 N.Y.S.2d 292 (N.Y. App. 2004); *State v. Perkins*, 661 S.E.2d 366 (S.C. 2008); *State v. Wade*, 863 S.W.2d 406, 408 (Tenn. 1993); *Harris v. Commonwealth*, 689 S.E.2d 713 (Va. 2010); *State v. Cassill-Skilton*, 94 P.3d 407 (Wash. App. 2004). *See generally* National Drug Court Institute, *The Drug Court Judicial Benchbook* 164-69 (Douglas B. Marlowe & William G. Meyer eds., rev. 2017) (discussing the approaches of courts to determine the due process rights of defendants in drug courts).

[14]  *Morrissey v. Brewer*, 408 U.S. 471 (1972); *Gagnon v. Scarpelli*, 411 U.S. 778 (1973).

[15]  *Morrissey*, 408 U.S. at 480 ("Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions.").

[16]  *Gagnon*, 411 U.S. at 782; *see also Paul v. State*, 560 P.2d 754, 756 (Alaska 1977) (explaining due process requirements apply to both parole and probation revocations).

successful effort at rehabilitation nor imprudently prejudicing the safety of the community.[17]

The same interests are at stake in therapeutic court programs. As the Nebraska Supreme Court explained in *State v. Shambley*:

> As with parole and probation, it is in the State's interests that drug court participants are restored to a normal and useful life. This is, after all, the point of the program. Accordingly, the State, like the participant, has an interest in seeing that there is a termination process which ensures participants are not terminated from the program because of erroneous information or because of an erroneous evaluation of the need to terminate.[18]

An Illinois appellate court similarly explained:

> The drug-court program is a form of conditional liberty like supervision, probation, or parole. Each program requires the participant to comply with certain conditions or face the loss of the privilege. Revocation of that privilege may not be accomplished without inquiry.
>
> . . . .
>
> Even though defendant did not have the right to participate in the drug-court program, as it was a matter of legislative and judicial grace, due process should circumscribe summary dismissal from that program.[19]

---

    [17] *Gagnon*, 411 U.S. at 785; *see also Morrissey*, 408 U.S. at 484 ("Society thus has an interest in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole, given the breach of parole conditions.").

    [18] *Shambley*, 795 N.W.2d at 894.

    [19] *People v. Anderson*, 833 N.E.2d 390, 395 (Ill. App. 2005).

Recognizing that due process applies to terminations from therapeutic court programs is also consistent with the intended rehabilitative purpose of such programs. As the United States Supreme Court explained in the context of parole revocations, "Society has a further interest in treating the parolee with basic fairness: Fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness."[20] The same is true with regard to participants facing termination from a therapeutic court program. If the process is fair, the participant is more likely to accept the outcome, even if adverse.

The question, therefore, becomes how much process is due to a participant facing termination from a therapeutic court program? As the Supreme Court emphasized in *Morrissey*, the requirements of due process are flexible, and "not all situations calling for procedural safeguards call for the same kind of procedure."[21] Because parole and probation revocations are not part of a criminal prosecution, the full panoply of rights due to a defendant in a criminal proceeding does not apply. Instead, the procedures can be more flexible and informal than would occur at a criminal trial.[22]

Ultimately, the due process protections recognized in *Morrissey* and *Gagnon* include: (1) written notice of the claimed violations; (2) disclosure to the parolee/probationer of the evidence against them; (3) the opportunity to be heard in person and to present witnesses and documentary evidence; (4) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (5) an independent decisionmaker; and (6) a record by

---

[20] *Morrissey*, 408 U.S. at 484.

[21] *Id.* at 481.

[22] *Id.* at 489-90; *Gagnon*, 411 U.S. at 781-82.

– 17 –                                                                 2711

the factfinder as to the evidence relied on and the reasons for revoking parole or probation.[23]

These requirements are not intended to result in overly formalized procedures. As the Supreme Court emphasized, "[T]he process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversar[ial] criminal trial."[24]

Moreover, a court's failure to comply with one of these requirements does not automatically require reversal of the revocation on appeal.[25] For example, the appellate court will not reverse a revocation solely because the probationer did not receive written notice if the probationer received adequate oral notice and there were no objections to a lack of notice in the proceedings below.[26]

In the current case, Mollica asserts that he "never received written notice of his potential termination from therapeutic court or the purported grounds for that termination." He also argues that he did not receive adequate oral notice.

---

[23] *Morrissey*, 408 U.S. at 489; *Gagnon*, 411 U.S. at 786. *Morrissey* and *Gagnon* both require a "written statement" of the factfinder's decision, but subsequent case law has made clear that this requirement is met by an oral record. *See Black v. Romano*, 471 U.S. 606, 616 (1985); *United States v. Yancey*, 827 F.2d 83, 88-89 (7th Cir. 1987); *see also* 2 Neil P. Cohen, *The Law of Probation and Parole* § 25:22 (2d ed. 2020) (describing the purposes served by the record of a revocation hearing and the necessary components to be included in the record under *Morrissey*).

[24] *Morrissey*, 408 U.S. at 489.

[25] *Cf.* 2 Neil P. Cohen, *The Law of Probation and Parole* § 18:3 (2d ed. 2020) ("In sketching these mandatory procedures, the *Morrissey* Court was careful to note that it was not trying to create an 'inflexible structure.' The actual details of revocation procedures, it held, were the responsibility of individual states.").

[26] *See State v. Patton*, 68 N.E.3d 273, 277 (Ohio App. 2016).

But the record indicates otherwise. As the State points out, Mollica received written notice of his potential termination from the therapeutic court when the State filed its motion for immediate remand for violating the conditions of his release in the Palmer Wellness Court. The motion was supported by an affidavit that detailed the violations, which included Mollica absconding from his housing program, using illegal drugs, failing to attend therapeutic meetings, driving and then abandoning his car in the middle of the road, and being arrested for a new criminal offense, criminal trespass.

It is true that the motion for immediate remand did not directly apprise Mollica of the fact that he was facing termination based on this conduct. But the record demonstrates that Mollica was well aware of that fact. Both the judge and the prosecutor had warned Mollica at the September 14 hearing that he needed to comply fully with the program after being conditionally reinstated following the domestic violence assault against his girlfriend. Despite these warnings, Mollica left the hearing and engaged in the conduct that led to his termination.

Mollica's statements at the September 28 hearing also demonstrate that he was well aware that he was facing termination based on his recent conduct. And there is nothing in the record to suggest that he was unprepared for the September 28 hearing. Indeed, the record suggests that he had arranged for another Wellness Court participant to speak on his behalf at that hearing.

Given these circumstances, we reject Mollica's claim that he did not receive adequate notice of the termination hearing or the grounds for termination.

We likewise reject Mollica's claim that he was never provided with an opportunity to be heard with regard to the discharge decision. The record shows that Mollica was given an opportunity to be heard at the September 28 hearing and to present any defense or mitigating evidence he might have. At that hearing, Mollica admitted to using drugs and absconding from the housing program, but he put forward the mitigating

explanation that he had not returned to the housing unit because he did not want to jeopardize the sobriety of the other participants. Mollica also asserted that he was at the Anchorage Police Department because he wanted to turn himself in. Contrary to Mollica's arguments on appeal, there is nothing in the record to suggest that Mollica felt he was being treated unfairly or that there was additional evidence or information that Mollica wanted the court to consider.

We also note that Mollica was expressly given an opportunity to be heard at the October 5 hearing in which the therapeutic court judge made her final decision regarding termination. Mollica took this opportunity to request the recommendation for the Residential Substance Abuse Treatment program, but he had nothing additional to say.

On appeal, Mollica takes issue with the therapeutic court judge's reference in the October 5 hearing to "previously unmentioned incidents" — namely, Mollica bringing an intoxicated woman to treatment and Mollica pressuring his girlfriend to write him a letter of support. Mollica argues that the judge's references to these incidents show that "the purported basis for which Mollica faced termination shifted during the proceedings."

We disagree with this characterization of the record. It is clear from the record that Mollica was terminated from the program because of his conduct on September 14 and 15 — the conduct for which he had notice and an opportunity to respond. It is also apparent that this conduct led to his termination because it occurred only days after he was released from custody for committing what was an otherwise disqualifying domestic violence assault against his girlfriend.

Notably, neither Mollica nor his attorney objected to the references to the other incidents mentioned at the October 5 hearing. Nor did either of them express

surprise at the references to the other incidents. On the contrary, it appears that the court was referencing incidents that were already known to the parties.

We also do not find persuasive Mollica's assertion on appeal that he never had an opportunity to respond to these allegations. Even if Mollica felt ill-prepared to respond to these incidents in the October 5 hearing, Mollica could certainly have challenged the incidents at his later disposition hearing. Indeed, we would expect that Mollica *would* have challenged them at the disposition hearing if he actually believed they had been important to the court's decision to discharge him and if he, in fact, had grounds to challenge them. Accordingly, we conclude that any error in the court's reference to additional incidents at the October 5 hearing was harmless given the larger context in which they occurred and the due process protections that Mollica did receive.

All that said, we agree, as a general matter, that a defendant should be given notice and an opportunity to respond to information that will be used against them in a termination decision. We note that therapeutic judges are privy to a significant amount of information about therapeutic court participants and that much of this information is shared in off-the-record team meetings where the defendants' attorneys are present, but defendants are not. While we recognize the value of informality in therapeutic court proceedings as a general matter, we encourage courts to adopt more formalized procedures for termination hearings in order to ensure that basic due process protections are met.[27]

---

[27] The question of what process is due for intermediate sanctions is not before us in this case. We note, however, that courts in other jurisdictions have held that intermediate sanctions do not implicate the same due process concerns as the decision to terminate a participant from the program. *See State v. Rogers*, 170 P.3d 881, 886 (Idaho 2007) (explaining that it is not the court's intent to impede the functioning of diversionary programs,"[i]ntermediate sanctions imposed in these programs do not implicate the same due

(continued...)

Mollica also argues that he was denied due process because, according to Mollica, the court failed to identify the "progressive sanctions" and "treatment adjustments" that had previously been made in his case. But it is clear from the record that the parties were already aware of the prior sanctions, such as six hours of community service, and treatment adjustments, such as Mollica's placement in transitional housing. They were also aware that Mollica had been conditionally reinstated in the program after his domestic violence assault against his girlfriend only as an act of clemency. On appeal, Mollica attempts to downplay the significance of that assault and the fact that his new misconduct occurred only three days after he was released from custody for the assault. But this background was clearly considered by the therapeutic court judge and formed an important part of her discharge decision.

Lastly, we note that Mollica's case stands in stark contrast to cases in other jurisdictions where termination decisions have been vacated because of a denial of due process.[28] In *State v. Shambley*, for example, Shambley was discharged from a therapeutic court for testing positive for drugs.[29] Shambley denied that she had used drugs on that occasion. At the termination hearing, Shambley was told that the team had

---

[27]  (...continued)
process concerns, and continued use of informal hearings and sanctions need not meet the procedural requirements" that apply to termination decisions).

[28]  *See, e.g.*, *People v. Anderson*, 833 N.E.2d 390 (Ill. App. 2005) (defendant summarily dismissed from drug court without a hearing); *Gosha v. State*, 931 N.E.2d 432 (Ind. App. 2010) (defendant discharged without prior notice and over his request for an evidentiary hearing); *Harris v. Commonwealth*, 689 S.E.2d 713 (Va. 2010) (defendant not present at termination hearing from drug court and given no opportunity to be heard); *State v. Cassill-Skilton*, 94 P.3d 407 (Wash. App. 2004) (defendant discharged despite no notice of violations, no record of any hearing, and no record of any findings by trial court).

[29]  *State v. Shambley*, 795 N.W.2d 884, 890 (2011).

recommended that she be discharged and that she bore the burden of showing why discharge was not appropriate. The only evidence produced to support the termination was a letter with attachments from the drug court coordinator summarizing Shambley's difficulties in drug court. The attachments included an e-mail from an unidentified author to an unnamed recipient asserting that one of the drug tests in question was "negative with a weak concentration, but should nevertheless be considered a positive result."[30] Shambley's lawyer objected to any consideration of the letter or its attachments on hearsay and foundation grounds. The lawyer also objected on due process grounds, asserting that Shambley had not been given proper notice and was unable to challenge the hearsay reports and unauthorized laboratory reports effectively. The therapeutic court judge overruled all of these objections. The Nebraska Supreme Court later overturned these rulings and agreed with Shambley that basic due process protections had not been met.[31]

Here, in contrast to *Shambley*, Mollica never objected to any of the procedures used to discharge him from the program. Mollica also never suggested that there was evidence that he wanted to challenge, or additional testimony or proof that he wanted to present. Indeed, the record shows that Mollica directly admitted the conduct at issue and that he had a meaningful opportunity to challenge the grounds for termination.

To summarize, we now join courts in other jurisdictions in holding that a defendant facing termination from a therapeutic court program is entitled to due process protections akin to the limited due process protections that apply to parolees and probationers facing revocation of their parole or probation. These protections include

---

[30] *Id.*

[31] *Id.* at 895, 889-90.

written notice of the grounds for discharge, disclosure of the evidence against the participant, and an opportunity to rebut that evidence and offer any defenses or mitigating information.

However, because we are convinced, based on our review of the entire record, that Mollica received these basic due process protections and that any deficiencies in the procedures used to terminate Mollica from the Palmer Wellness Court did not prejudice Mollica, we affirm the termination decision in this case.

*Mollica's excessive sentence claim*

Mollica separately raises an excessive sentence claim with regard to his sentence for the second petition to revoke probation in his Anchorage case.

After being discharged from Wellness Court, Mollica faced sentencing in his two underlying cases — 3AN-11-04977 CR (the second petition to revoke probation in the Anchorage robbery case) and 3PA-16-02513 CR (the Palmer criminal mischief case). In the Palmer case, the court imposed the 30-month sentence that the parties had agreed to as part of their Rule 11 agreement. In the Anchorage case, the court scheduled a disposition hearing to address the second petition to revoke probation.

At the disposition hearing, the prosecutor reviewed Mollica's criminal history, which included three prior felonies, the underlying robbery, and the new criminal convictions Mollica had accrued through his probation violations. The prosecutor argued that all of Mollica's suspended time (approximately 4 years and 10 months) should be imposed, asserting that probation was not working for Mollica. Mollica's probation officer agreed that Mollica's probation should be terminated, and he should receive a flat sentence — *i.e.*, a sentence that did not include probation or suspended time. The defense attorney argued that Mollica should receive a shorter sentence and then be returned to probation.

The court found that Mollica "violated his probation to the letter[,] . . . he ha[d] seriously not done well on probation for this robbery, and . . . the court would be well within its right to impose all of his time." However, the court concluded that the full amount of suspended time was not necessary given the time Mollica would serve in the Palmer criminal mischief case. Therefore, the court terminated Mollica's probation and imposed 3 years to serve of the approximately 4 years and 10 months remaining on Mollica's sentence.

Mollica now appeals the 3-year sentence as excessive, raising several arguments. First, he contends that he is entitled to be resentenced because he was deprived of an opportunity to meaningfully respond to the court's reasons for discharging him from Wellness Court. But as already explained, Mollica was given a meaningful opportunity to respond to the reasons for discharge at the Wellness Court hearings. Moreover, there is nothing in the record to suggest that Mollica had additional information that he wanted the court to consider at the disposition hearing that he was not allowed to submit.[32]

Mollica also argues that the trial court failed to consider the underlying circumstances of Mollica's offense — the second-degree robbery in which Mollica pulled out a fixed-blade knife after he was caught shoplifting. But the record shows that the facts of the underlying offense were discussed at the disposition hearing, and Mollica and his attorney had the opportunity to make whatever mitigating arguments they wanted regarding that offense. The record also indicates that the court did not simply reflexively

---

[32] *Contrast Harris*, 689 S.E.2d 713 (remanding case for resentencing where defendant was not given a discharge hearing and the trial court also refused at the disposition hearing to consider defendant's evidence regarding the reasons for defendant's discharge from the drug court program).

impose the remaining suspended time but instead considered the *Chaney* criteria and imposed only a portion of the remaining suspended time.[33]

When we review an excessive sentence claim, we independently examine the record to determine whether the sentence is clearly mistaken.[34] The "clearly mistaken" standard contemplates that different reasonable judges, confronted with identical facts, will differ on what constitutes an appropriate sentence and that a reviewing court will not modify a sentence that falls within a permissible range of reasonable sentences.[35]

We have independently reviewed the sentencing record in this case, and we conclude that the sentence imposed here is not clearly mistaken.

*Conclusion*

The judgment of the superior court is AFFIRMED.

---

[33] *See Toney v. State*, 785 P.2d 902, 903 (Alaska App. 1990) (explaining that, when imposing a defendant's suspended sentence, the sentencing court must consider "all available sentencing evidence" in light of the *Chaney* criteria (citing *State v. Chaney*, 477 P.2d 441, 443-44 (Alaska 1970))); *see also DeMario v. State*, 933 P.2d 558, 562 (Alaska App. 1997).

[34] *See McClain v. State*, 519 P.2d 811, 813-14 (Alaska 1974).

[35] *See Erickson v. State*, 950 P.2d 580, 586 (Alaska App. 1997).