NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>*. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| DEREK JAMES SACLAMANA,<br><br>Appellant,<br><br>v.<br><br>STATE OF ALASKA,<br><br>Appellee. | Court of Appeals No. A-13763<br>Trial Court No. 3AN-19-03717 CR<br><br>O P I N I O N<br><br>No. 2790 — September 6, 2024 |

Appeal from the Superior Court, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Julia Bedell, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for the Appellant. RuthAnne Beach, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Terrell, Judges.

Judge WOLLENBERG.

Derek James Saclamana pleaded guilty, pursuant to an Alaska Criminal Rule 11 agreement, to one count of third-degree assault.[1] Under the agreement, the

---

[1]    AS 11.41.220(a)(5).

parties stipulated that Saclamana would enter the Anchorage Wellness Court, a therapeutic court focused on substance abuse treatment.[2] If he successfully completed the program, his conviction would be reduced to a misdemeanor and he would receive a more lenient sentence. If he did not successfully complete the program, he would receive a sentence of 3 years to serve on the third-degree assault.

Throughout Saclamana's participation in the program, he failed to appear for multiple drug tests. One of the terms of the Wellness Court agreement stated that Saclamana "will" be discharged from Wellness Court if he "missed" six drug tests. After Saclamana did not appear for six scheduled drug tests, the court held an evidentiary hearing, found that Saclamana had "missed" six drug tests in violation of this provision, and subsequently discharged Saclamana from Wellness Court.

In this appeal, Saclamana raises two challenges to the court's discharge decision.

First, Saclamana argues that he did not "miss" the drug tests, but rather, was merely late in submitting to his tests. Saclamana notes that, in each instance, he appeared for a drug test within twenty-four hours.

Second, Saclamana argues that the superior court erred in concluding that it was required to discharge him from Wellness Court once it determined that he had missed six drug tests. Saclamana argues that the court had discretion to decline to discharge him, despite the fact that the written agreement stated that missing six drug tests "will" be grounds for discharge. In support of this argument, Saclamana points to a separate provision in his agreement that stated that the superior court has "sole discretion" over final discharge decisions, and he notes that the judge who presided over

---

[2]     *See Gou-Leonhardt v. State*, 323 P.3d 700, 701 (Alaska App. 2014) (describing Wellness Court as "a jail diversion program for substance abusers that seeks to promote their abstinence and recovery by offering them intensive treatment and community supervision in lieu of imprisonment").

his Wellness Court hearings expressed reservations about discharging Saclamana and imposing a 3-year sentence.

The State contests Saclamana's claims. As a threshold matter, the State argues that, under the terms of the plea agreement, Saclamana waived his right to appeal the court's discharge decision and that this Court should decline to consider his claims on the merits. But having reviewed the record, we conclude that Saclamana did not knowingly and intelligently waive his right to appeal any future discharge, and we therefore reach the merits of Saclamana's claims.

On the merits, the State contends that the term "missed" is not ambiguous, and that any potential confusion was eliminated as Saclamana progressed through the program and was sanctioned for failing to timely appear for the tests. The State also disputes Saclamana's claim that the judge had the unilateral authority to retain Saclamana in the Wellness Court program despite his six "missed" tests. The State argues that a "savings clause" in the agreement — which authorizes the discretionary reinstatement of a participant who has otherwise violated a provision "requiring discharge," with the unanimous consent of the therapeutic team — would be rendered superfluous if the judge could simply override the team's decision.

Having reviewed the record, we agree with the superior court's interpretation of the term "missed." We further conclude that the court correctly ruled that it was bound by the agreement reached by the parties, and that, in the absence of the savings clause being invoked, the agreement required discharge once the court found that Saclamana had missed six drug tests. Accordingly, we affirm the judgment of the superior court.

*Underlying facts and proceedings*

In April 2019, Anchorage police responded to a report of a domestic violence assault at the home that Derek James Saclamana shared with L.T. According to the charging document, Saclamana had pushed and shoved L.T. and also "violently"

shaken her. Saclamana had punched holes in the wall, smashed a chair, and broken down a door, which hit their child. Upon his arrest, Saclamana tried to kick the arresting officers multiple times.

For this conduct, Saclamana was charged with three counts of third-degree assault, four counts of reckless endangerment, and one count of fifth-degree criminal mischief.[3]

The parties subsequently entered into a Criminal Rule 11 agreement. Pursuant to the agreement, Saclamana pleaded guilty to one count of third-degree assault,[4] and the State dismissed the remaining charges. The agreement further provided that Saclamana would enter the Anchorage Wellness Court program.[5] If Saclamana successfully completed the program, he would be convicted of a reduced count of fourth-degree assault and sentenced to 360 days with 360 days suspended.[6] But if Saclamana was discharged from the program, his conviction for third-degree assault would remain, and he would be sentenced to 3 years to serve.

As part of his Rule 11 agreement, Saclamana signed a written agreement regarding the Wellness Court program. This agreement laid out numerous terms and conditions of the program, including circumstances that could lead to Saclamana's discharge. The agreement separated these circumstances into two different categories: one provision listed circumstances that "may" justify discharge, while a separate

---

[3] Saclamana was charged with two counts of third-degree assault under AS 11.41.220(a)(5) and one count under AS 11.41.220(a)(1)(c)(i), four counts of reckless endangerment under AS 11.41.250, and one count of fifth-degree criminal mischief under AS 11.46.486(a)(2).

[4] AS 11.41.220(a)(5).

[5] We will generally refer to this program as "Wellness Court." Saclamana's Rule 11 agreement also refers to the Wellness Court program as the "Drug Court program."

[6] AS 11.41.230(a)(1).

provision listed circumstances that "will" justify discharge — *i.e.*, circumstances that mandated discharge.[7]

The written agreement also included a footnote containing a savings clause that provided a limited opportunity for Saclamana to remain in the Wellness Court program, even if he engaged in conduct that would otherwise require discharge. This clause stated that Saclamana's therapeutic court team (which included the Wellness Court judge, prosecutor, defense attorney, and probation officer or case manager) "reserve[d] the right to review each situation requiring discharge from the program on a case-by-case basis." If the team was in unanimous agreement that Saclamana should remain in the program despite engaging in conduct that "require[d] discharge," the clause provided that Saclamana "may be conditionally reinstated in the program."

Two paragraphs after the mandatory discharge provision (which contained the footnote with the savings clause), the agreement contained another provision that stated that "[t]he final decisions about discharge are in the Court's sole discretion."

The agreement also provided in multiple places that Saclamana "ha[d] no right to appeal the Court's decisions."

In July 2019, Saclamana signed the agreement and entered the Wellness Court program.

In September 2020, the State moved to discharge Saclamana from the Wellness Court program for missing six drug tests. In particular, the State invoked the provision of the agreement that provided that Saclamana "will be discharged" upon "six

---

[7] The agreement set out four different circumstances in which a participant "will be discharged" from the program.

positive, missed, diluted, tampered or falsified drug tests after admission to the drug court program."[8]

Saclamana contested his discharge, and the superior court held an evidentiary hearing where Saclamana's probation officer, Ebony Evans, testified.

Evans testified that the Wellness Court conducted drug testing Monday through Friday, twice per day: from 8:00 a.m. to 10:00 a.m., and from 1:00 p.m. to 3:00 p.m. Wellness Court participants were randomly tested, and Saclamana was required to call each day to determine whether he had to test. Evans testified that Saclamana missed six drug tests, with his first miss occurring in November 2019. She testified that throughout the next year, Saclamana missed additional tests, with his sixth missed test occurring in September 2020. (Evans also testified that Saclamana missed a drug test in late December 2019 because he was in custody on an old warrant and that the judge had excused this drug test, so it did not count as being "missed.")

Evans testified that Saclamana was told that, if he missed a drug test, he was required to provide a test sample the next available day, and in all but one of these instances, he provided a negative sample.[9] In fact, Evans confirmed that Saclamana had provided over sixty clean samples during his participation in Wellness Court. Even so,

---

[8]    In this opinion, we will refer to Saclamana's missed tests as "drug tests," the phrasing used in the Wellness Court agreement. The parties also refer to the tests as "UAs" (*i.e.*, urinalysis tests).

[9]    The circumstances of Saclamana's fifth missed drug test, on March 2, 2020, were slightly different than the other missed tests. Saclamana was approved for a travel pass to attend his grandmother's funeral in Nome from February 28 through March 1, 2020. As a condition of the travel pass, Saclamana was required to drug test before 9:00 a.m. on March 2 (the day after his return). Saclamana did not appear for the drug test by 9:00 a.m. on March 2. Evans called Saclamana that morning, and Saclamana told Evans that he had overslept. Saclamana then showed up to drug test at 2:00 p.m. that afternoon but could not provide a sample and self-reported alcohol use. Saclamana argued in the trial court that this drug test should not be counted as a missed test because he self-reported alcohol use. Saclamana has not renewed that challenge on appeal.

Evans testified that Saclamana sometimes struggled to make progress in Wellness Court and she discussed with him the need to focus on time management and on the things he needed to get done because, under his plea agreement, he would serve 3 years in jail if he was not successful in Wellness Court.

Evans further testified that Saclamana received various sanctions following his missed drug tests. These sanctions increased in severity after each missed test: After his first missed test, Saclamana was given a verbal warning and a fine.[10] After his second missed test, he was subjected to increased drug testing for two weeks, a fine, and another verbal warning. After his third missed test, he was subjected to increased drug testing for thirty days, mandatory community work service, a fine, and a verbal warning that another missed drug test would result in a remand. After his fourth missed test, he was remanded to custody for 48 hours and received a fine. And after his fifth missed test, he was remanded to custody for 7 days and received a fine.

Evans also testified that she had spoken with Saclamana about being close to discharge due to the missed drug tests and that the judge had warned Saclamana that he was perilously close to being discharged from the program because of his missed tests.

At the evidentiary hearing, Saclamana contested his discharge under two theories. First, he argued that the term "missed" was ambiguous, and that any ambiguity in the agreement should be construed in Saclamana's favor. According to Saclamana, he was merely *late* in submitting his drug tests, and (with one exception) provided a negative sample the next available day after the missed tests.

In the alternative, Saclamana argued that the superior court had discretion not to discharge him. According to Saclamana, although the agreement provided that a sixth missed drug test "will" result in a discharge, the agreement also stated that the

---

[10]  Saclamana was also required to pay $30 (the cost of the drug test) each time that he missed a drug test.

court retained "sole discretion" regarding discharge decisions. Saclamana argued that the court should resolve these seemingly contradictory provisions in his favor and decline to discharge him.

The superior court rejected Saclamana's arguments and determined that it did not have discretion to keep Saclamana in Wellness Court after he missed six drug tests. The superior court, however, expressed frustration with the entire situation.

In particular, the superior court expressed frustration with having to sentence Saclamana to 3 years in jail, but the court also expressed frustration with Saclamana for his failure to comply with the drug-testing requirements of Wellness Court. The superior court noted that it was "saddened that the therapeutic team didn't elect to keep [Saclamana] in the program" but stated that it "underst[ood] it because [Saclamana] . . . kept doing the same thing over and over and over again." Specifically, the superior court stated:

> Now, in your situation, I have been beating my head against the wall wishing that I could hon — with honesty figure out a way not to put you in jail. I begged you the fifth time you missed to be careful, to understand the enormous consequences that will take place if you don't do the simplest thing. I tried to get across to you, you have to show up, and I don't know why you're incapable of doing that.

The superior court also expressed concern that, if Saclamana were allowed to remain in Wellness Court, he would continue to miss drug tests:

> [I]f not six, how many? Eight? Ten? What's the number? And — because I said I don't understand why this man is not — isn't showing up. I don't get it, but it sure looked to me like even if I said not six but eight or ten or a dozen we'd get there, and, unfortunately, you missed another one apparently.[11] And I'm not making that finding, that's the allegation, but you didn't show up and that makes me crazy

---

[11]  Saclamana's attorney indicated that Saclamana had missed another drug test — his seventh — the day after the court held the first part of the evidentiary hearing to address Saclamana's discharge from Wellness Court.

because it supports the State's theory that you should be discharged.

Ultimately, the superior court indicated that, if it had discretion, it would not sentence Saclamana to 3 years in jail and would instead sanction Saclamana to some lesser amount of jail time but that it did not have discretion under the plea agreement. Accordingly, the court entered a conviction for third-degree assault and sentenced Saclamana to 3 years to serve.

This appeal followed.

*Why we conclude that Saclamana did not knowingly and intelligently waive the right to appeal his discharge from Wellness Court*

We first address the State's argument that, under the terms of the plea agreement, Saclamana waived his right to appeal his discharge from Wellness Court.

Upon pleading guilty, Saclamana signed a written plea agreement, which contained several provisions that limited his right to appeal. The superior court also conducted a plea colloquy with Saclamana when he pleaded guilty to the third-degree assault charge. As part of the colloquy, the court informed Saclamana that he was giving up his right to appeal certain aspects of his case.

The State argues that Saclamana waived his right to appeal his discharge from Wellness Court, as evidenced by the terms of the written plea agreement and the plea colloquy. Saclamana disputes that he waived his right to appeal, arguing that the waiver was invalid because it was not knowing and intelligent. Saclamana also argues that the waiver provision violates his due process rights and is against public policy.

Alaska courts have not yet addressed the validity of broad waivers of a defendant's appellate rights.[12] Most jurisdictions that have considered the issue allow a

---

[12] *See Mollica v. State*, 500 P.3d 1002, 1010 (Alaska App. 2021) (concluding that the defendant's waiver of his right to appeal the discharge decision from Wellness Court did

defendant to expressly waive their appellate rights.[13] But even assuming the validity of appellate waivers generally, these waivers still must be made "intelligently, voluntarily and with an understanding of the consequences."[14] As we have previously recognized, "In order to knowingly and intelligently waive a right, a defendant must understand the risks involved in that decision."[15]

To that end, courts in other jurisdictions have held or implied that a defendant must know they have a right to appeal in the first place in order to knowingly and intelligently waive this right.[16] Courts have also emphasized that a defendant's

---

not apply to his due process challenge to the discharge procedures and thus declining to address the validity of the appeal waiver provision).

[13] *See, e.g.*, *People v. Barton*, 174 P.3d 786, 790 n.4 (Colo. 2008) (en banc) ("[O]ther courts have held that appeal waivers in plea agreements are valid. Indeed, every federal circuit court that has considered the issue has upheld the validity of appeal waivers."); *People v. Seaberg*, 541 N.E.2d 1022, 1024 (N.Y. 1989) (noting that enforcing an otherwise valid appeal waiver is "consistent with the decisions in a majority of jurisdictions"); *State v. Perkins*, 737 P.2d 250, 251 (Wash. 1987) (en banc) ("[T]he majority of courts which have considered the issue have held that there is nothing illegal per se about a waiver of the right to appeal.").

[14] *Perkins*, 737 P.2d at 251; *see also United States v. Teeter*, 257 F.3d 14, 24 (1st Cir. 2001) (holding that when a reviewing court assesses an appeal waiver, it must determine whether "the defendant freely and intelligently agreed to waive her right to appeal"); *United States v. Ready*, 82 F.3d 551, 556-57 (2d Cir. 1996) ("Every circuit to consider the issue has concluded that waivers of the right to appeal a sentence, like waivers of constitutional rights, are invalid unless they are voluntary and knowing."), *superseded on other grounds by United States v. Cook*, 722 F.3d 477, 481 (2d Cir. 2013); *United States v. Andis*, 333 F.3d 886, 890 (8th Cir. 2003) (stating that each part of a plea agreement — including an appeal waiver, if applicable — must be entered into knowingly and voluntarily); *Petition of Manula*, 866 P.2d 1127, 1128-29 (Mont. 1993) (collecting cases); *Seaberg*, 541 N.E.2d at 1026 (stating that an enforceable appeal waiver "must not only be voluntary but also knowing and intelligent").

[15] *Alaska Pub. Def. Agency v. Superior Ct.*, 530 P.3d 604, 619 (Alaska App. 2023); *see also United States v. Guillen*, 561 F.3d 527, 529 (D.C. Cir. 2009).

[16] *See, e.g.*, *Guillen*, 561 F.3d at 528-29, 531 (upholding appeal waiver because, *inter alia*, the trial court advised the defendant that she was "giving up her right to appeal any

understanding of the waiver must be "evident on the face of the record."[17] This includes ensuring that defendants "comprehend that an appeal waiver 'is separate and distinct from those rights automatically forfeited upon a plea of guilty.'"[18]

Accordingly, to determine whether an appeal waiver was knowing and voluntary, courts examine both the transcript of the plea colloquy and the written plea agreement containing the waiver.[19] Many federal circuit courts of appeals have required, or at least voiced a strong preference, that the trial court conduct an oral plea

---

sentence she receives"); *United States v. Agee*, 83 F.3d 882, 887 (7th Cir. 1996) (invalidating a purported appeal waiver because, *inter alia*, the record did not indicate that the defendant's "right to appeal was explained to him" before he waived his right); *Watson v. State*, 808 So. 2d 77, 80 (Ala. App. 2001) (stating that "a colloquy with the defendant that reflects that he or she was informed of the right to appeal and that he or she chose to waive this right" can constitute an enforceable waiver); *see also United States v. Bushert*, 997 F.2d 1343, 1351 (11th Cir. 1993) (concluding that "the defendant's knowledge . . . of the sentence appeal waiver is one of the components that constitutes the 'core concern' of the defendant's right to 'be aware of the direct consequences of his guilty plea'" (quoting *United States v. Zickert*, 955 F.2d 665, 668 (11th Cir. 1992))); *see generally Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.").

[17] *People v. Bradshaw*, 961 N.E.2d 645, 651 (N.Y. 2011) (quoting *People v. Lopez*, 844 N.E.2d 1145, 1149 (N.Y. 2006)); *see also Bushert*, 997 F.2d at 1351 (stating that for there to be an enforceable waiver, the government must show either that the trial court conducted an oral colloquy, or that "it is manifestly clear from the record" that the defendant understood the waiver).

[18] *Bradshaw*, 961 N.E.2d at 650 (quoting *Lopez*, 844 N.E.2d at 1149).

[19] *See, e.g.*, *Teeter*, 257 F.3d at 24; *United States v. Edgar*, 348 F.3d 867, 872 (10th Cir. 2003); *Bushert*, 997 F.2d at 1351-52 (rejecting the view that "an examination of the text of the plea agreement is sufficient to find the waiver knowing and voluntary," and stating that "in most circumstances, for a sentence appeal waiver to be knowing and voluntary, the district court must have engaged the defendant about the sentence appeal waiver during the [plea colloquy]").

colloquy, at which point the trial court must inquire specifically into any waiver of the defendant's appellate rights.[20]

In this case, the superior court conducted an oral colloquy at the change-of-plea hearing in which Saclamana conditionally pleaded guilty to third-degree assault. During this hearing, the court reviewed aspects of Saclamana's plea agreement and advised Saclamana about various rights he was giving up as a part of that agreement, including his right to appeal. The court and Saclamana had the following exchange about his right to appeal:

---

[20] *See Teeter*, 257 F.3d at 24 (holding that the trial court "must inquire specifically at the change-of-plea hearing into any waiver of appellate rights"); *Ready*, 82 F.2d at 557-58 (holding that defendant's appeal waiver was unenforceable after the court "did not mention the right to appeal or explain the consequences of waiving this right," even where defense counsel assured the court that the defendant gave up "his right to appeal any sentence that might be rendered here pursuant to [the plea] agreement"); *United States v. Wessells*, 936 F.2d 165, 167-68 (4th Cir. 1991) (declining to enforce appeal waiver where defendant's written plea agreement informed him that he waived "any . . . ground to appeal any sentence," but where the trial court "did not question [the defendant] specifically concerning the waiver provision of the plea agreement"); *United States v. Smith*, 618 F.3d 657, 664-65 (7th Cir. 2010) (declining to enforce an appeal waiver because the trial court "fail[ed] during the plea colloquy to advise [the defendant] of the terms of the appellate waiver and determine whether he understood the provision," even where the written plea agreement containing an appellate waiver "was reasonably clear"); *United States v. Lo*, 839 F.3d 777, 784 n.1, 786-87 (9th Cir. 2016) (stating that the requirement that a court advise a defendant that they are waiving their right to appeal has been codified in Federal Rule of Criminal Procedure 11(b)(1)(N), and finding that because the trial court "thoroughly" reviewed defendant's plea agreement during the change-of-plea hearing, the waiver was entered into knowingly); *Bushert*, 997 F.2d at 1351 ("[I]n most circumstances, for a sentence appeal waiver to be knowing and voluntary, the [trial] court must have specifically discussed the sentence appeal waiver with the defendant during the [change-of-plea] hearing."). *But see United States v. Michelsen*, 141 F.3d 867, 871-72 (8th Cir. 1998) (stating that "[a]lthough it might have been preferable for the [trial] court to have conducted a colloquy with [the defendant] regarding his waiver of appeal, such a dialogue is not a prerequisite for a valid waiver of the right to appeal"); *Edgar*, 348 F.3d at 871-72 (concluding that it is "always error for a [trial] court to fail to discuss an appellate waiver provision during a [plea] colloquy," but not always reversible error, particularly if, for example, the written agreement provided adequate warnings regarding the waiver).

*Court*: You're also giving up your right to appeal any mistakes which may or may not have occurred, as well as the sentence under either scenario, whether or not you complete Wellness program or you don't complete Wellness program, because you're agreeing to them. Do you understand that?

*Saclamana*: Yes.

The superior court's plea colloquy was insufficient to ensure that Saclamana understood that his plea agreement precluded his ability to appeal *future* decisions stemming from his time in Wellness Court. Indeed, the colloquy never informed Saclamana of his right to appeal Wellness Court decisions in the first place.

Rather, the superior court's colloquy referenced only the general rule that, by entering a plea of guilty, a defendant forfeits their right to appeal "non-jurisdictional defects" that may have occurred leading up to the plea.[21] The superior court said only that Saclamana was "giving up [his] right to appeal any mistakes *which may or may not have occurred*, as well as the sentence under either scenario, whether or not you complete Wellness program or you don't complete Wellness program." (Emphasis added.) The court never ensured that Saclamana understood that the appeal waiver pertaining to the Wellness Court's discharge decisions was "separate and distinct from those rights automatically forfeited upon a plea of guilty."[22]

Saclamana's written agreement contained similar problems. The agreement contained four provisions that constrained Saclamana's ability to appeal

---

[21] *Foy v. State*, 515 P.3d 659, 660 (Alaska App. 2022), *aff'd on reh'g*, 2023 WL 3000819 (Alaska App. Apr 18, 2023); *see also* 5 Wayne R. LaFave et al., *Criminal Procedure*, § 21.4(e), at 1004 (4th ed. 2015) (stating that a defendant generally forfeits the right to appeal their conviction by virtue of a guilty plea).

[22] *Bradshaw*, 961 N.E.2d at 650 (quoting *Lopez*, 844 N.E.2d at 1149); *cf. People v. Mason*, 40 N.Y.S.3d 694, 695 (N.Y. App. Div. 2016) (stating that, although the defendant's drug court contract contained a written waiver of the right to appeal, the trial court "did not conduct any colloquy concerning that waiver at the plea proceeding" and concluding that "the contract alone [was] insufficient to establish a valid waiver").

certain decisions stemming from his participation in the program. Specifically, the agreement provided:

> That by entering a plea of guilty . . . [Saclamana] is voluntarily . . . waiving [his] right to appeal [his] conviction or to appeal the terms of the agreement to enter the Anchorage Drug Court Program in this case.
>
> . . . .
>
> The final decisions about progress and continued participation are in the Court's sole discretion. [Saclamana] has no right to appeal the Court's decisions.
>
> . . . .
>
> The final decisions about the imposition of sanctions are in the Court's sole discretion. [Saclamana] has no right to appeal the Court's decisions.
>
> . . . .
>
> The final decisions about discharge are in the Court's sole discretion. [Saclamana] has no right to appeal the Court's decisions.

The first of these provisions — stating that, "by entering a plea of guilty," Saclamana was "waiving [his] right to appeal [his] conviction or to appeal the terms of the agreement to enter the Anchorage Drug Court Program" — was similar to the superior court's plea colloquy. That is, this provision related to the fact that Saclamana was forfeiting his right to challenge his conviction, which is distinct from challenging the Wellness Court's discharge decision.[23]

Although the remaining provisions of the written agreement provided that Saclamana could not appeal certain final decisions stemming from Wellness Court — including "final decisions about discharge" — the agreement never advised Saclamana

---

[23] *See id.*

that he had a right to appeal these decisions in the first place, absent his waiver.[24] Indeed, the written agreement stated ambiguously that Saclamana had "no right to appeal" the superior court's decisions.

For these reasons, we conclude that Saclamana did not knowingly and intelligently waive his right to appeal his discharge from Wellness Court.[25] Given our conclusion that Saclamana did not knowingly and intelligently waive his right to appeal under the facts of this case, we need not address the validity and potential scope of appellate waivers more generally.

Accordingly, we now proceed to consider the merits of Saclamana's claims.

*Why we reject Saclamana's argument that the term "missed" was ambiguous*

Saclamana first argues that the term "missed" in the written plea agreement was ambiguous. The agreement stated that Saclamana would be discharged from Wellness Court upon "six positive, *missed*, diluted, tampered or falsified drug tests." (Emphasis added.) According to Saclamana, his conduct was more akin to being late, rather than missing a test, because he submitted test samples the morning

---

[24] *See United States v. Bushert*, 997 F.2d 1343, 1350 (11th Cir. 1993) (noting the importance of the defendant's understanding of their right to appeal, absent a waiver); *State v. Loye*, 670 N.W.2d 141, 148 (Iowa 2003) (finding inadequate appeal waiver because, *inter alia*, the "[trial] court made no inquiry as to whether the defendant knew she had the right to appeal"); *Bradshaw*, 961 N.E.2d at 652 (finding inadequate appeal waiver where the defendant never orally confirmed that he "grasped the concept of the appeal waiver and the nature of the right he was forgoing").

[25] We note that Saclamana is not bringing a due process challenge to the procedures that led to his discharge from Wellness Court, for which the appellate waiver would not apply in any event. *See Mollica v. State*, 500 P.3d 1002, 1010 (Alaska App. 2021) (noting that the defendant's appellate waiver did not apply to his due process challenge to Wellness Court discharge procedures).

immediately after each scheduled drug test. He argues that in light of this ambiguity, the plea agreement must be construed against the State since it is "the party with the greater bargaining power."[26]

This Court has recognized that plea agreements are essentially contracts between the State and the defendant.[27] Accordingly, ambiguous or disputed terms in a plea agreement are governed by the principles of contract interpretation.[28] When a dispute arises regarding an undefined term in a contract, the trial court must examine "the reasonable expectations of the parties at the time they entered the agreement."[29] If the defendant and the State have "differing but objectively reasonable interpretations of the term," then the trial court "is required to construe the ambiguity against the State."[30]

The superior court in this case concluded that the plain meaning of the term "missed" was not ambiguous. The court stated that "in the context of the drug test, it's scheduled, you're told to do it at some time . . . and you're given a command to go and provide a sample, and if you don't, it's missed."

The court further indicated that the number of times Saclamana was sanctioned after each missed test undermined his position that he reasonably believed that he was complying with the program's terms. The superior court asked Saclamana's attorney, "Well, wouldn't we expect [Saclamana] to articulate his understanding of 'missed' the first, second, third, fourth or fifth time when he was sanctioned for . . .

---

[26] *Anthony v. State*, 329 P.3d 1027, 1032 (Alaska App. 2014) (citations omitted).

[27] *Ririe v. Municipality of Anchorage*, 474 P.3d 660, 664 (Alaska App. 2020); *Dutton v. State*, 970 P.2d 925, 928 (Alaska App. 1999).

[28] *Anthony*, 329 P.3d at 1031 (citing *Simon v. State*, 121 P.3d 815, 821 (Alaska App. 2005)).

[29] *Id.* at 1031-32.

[30] *Id.* at 1032.

this?" Saclamana's attorney acknowledged that he did not question the court's interpretation of the word "missed" when Saclamana was sanctioned. The court emphasized that "what's most disconcerting is the number of times judges told [Saclamana], 'We're not kidding around, this is serious.'"

The court found Saclamana's position — *i.e.*, that a drug test was not "missed" so long as he called his probation officer or appeared the following day — unreasonable. Accordingly, the court found that Saclamana's conduct constituted a "missed" drug test.

On appeal, Saclamana contends that the superior court should not have considered Saclamana's conduct after the formation of the plea agreement (namely, his subsequent sanctions), because the critical question was how the parties understood the contested term at the time the contract was created.

But Alaska law is clear that when a dispute regarding a contract term arises, the court is permitted to consider extrinsic evidence, including the conduct of the parties after the contract was entered into.[31] Indeed, the Restatement (Second) of Contracts recognizes that:

> Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.[32]

The commentary to the Restatement explains that the rationale for this "course of performance" evidence is that "[t]he parties to an agreement know best what

---

[31] *Nautilus Marine Enters., Inc. v. Exxon Mobil Corp.*, 305 P.3d 309, 316-17 (Alaska 2013); *Fairbanks North Star Borough v. Tundra Tours, Inc.*, 719 P.2d 1020, 1033 (Alaska 1986) (using the "parties' course of dealing" to interpret the contract at issue).

[32] Restatement (Second) of Contracts § 202(4) (Am. L. Inst. 1981).

they meant, and their action under it is often the strongest evidence of their meaning."[33] The Alaska Supreme Court has echoed this reasoning, stating that a party's conduct after the formation of a contract "is an indicator of what the parties intended at the time they formed their agreement."[34]

The superior court thus did not err by considering Saclamana's conduct after he entered the agreement. The superior court noted that Saclamana was sanctioned and reprimanded multiple times — *i.e.*, each time he did not appear for his scheduled drug test — and these sanctions included verbal warnings, fines, increased drug testing, mandatory community service, and remands to jail. The court also noted that after the first five times that Saclamana was sanctioned, he never argued that he did not "miss" the drug tests, or that the term "missed" was ambiguous. This course of conduct is "given great weight" in assessing Saclamana's understanding of the term "missed" when he entered the Wellness Court program.[35]

Moreover, we note that when Saclamana entered the program, he signed a "Drug/Alcohol Testing Program Agreement" that explained the process of reporting for drug testing and of collecting a urinalysis sample. This agreement specifically stated that "[i]f I *miss* a UA[,] I need to come to the courthouse the next day by 9am." (Emphasis added.) Saclamana initialed each procedure specified in the agreement, including this one. In addition, the Anchorage Felony DUI/Drug Court Participant Handbook states, "Any individual arriving later than the above times [for testing] will be considered a NO SHOW and reported as such." These provisions underscore the

---

[33] *Id.* at § 202 cmt. g.

[34] *Estate of Polushkin ex rel. Polushkin v. Maw*, 170 P.3d 162, 172 n.32 (Alaska 2007) (emphasis omitted) (quoting Arthur Linton Corbin, *Corbin on Contracts*, § 24.16, at 136 (rev. ed. 1998)).

[35] Restatement (Second) of Contracts § 202(4) (Am. L. Inst. 1981).

conclusion that the term "miss" includes situations in which Saclamana failed to appear until the day following the required drug test.[36]

Accordingly, the superior court did not err in ruling that the term "missed" was not ambiguous, and that Saclamana's conduct fit within the definition of "missed."[37]

This is not to say that a Wellness Court agreement could not be written to account for "late" drug tests or define a sanctionable "missed" drug test as one to which a participant fails to submit within twenty-four hours of being scheduled to test. We simply conclude that the trial court properly found that the parties to the agreement in this case did not intend to define "missed" in this manner.

*Why we reject Saclamana's argument that the superior court had discretion not to discharge him from the Wellness Court program*

Saclamana next argues that the superior court had discretion not to discharge him from Wellness Court, despite the fact that the written agreement provided that Saclamana "will" be discharged from the program upon six missed drug tests.

At the evidentiary hearing, the superior court recognized that there appeared to be contradictory provisions in the written agreement. The court noted that in one section, the agreement required the court to discharge Saclamana if he missed

---

[36] In the superior court, Saclamana's attorney objected to the court's reliance on these documents, and the superior court found it unnecessary to rely on them. But they are similarly reflective of Saclamana's course of conduct and provide further support for the superior court's conclusion.

[37] *See N. Pac. Processors, Inc. v. City and Borough of Yakutat*, 113 P.3d 575, 579 (Alaska 2005) ("We use our independent judgment when reviewing the trial court's interpretation of a contract. To the extent a trial court's findings are based on extrinsic evidence, we apply the clearly erroneous standard." (citations omitted)); *Anthony v. State*, 329 P.3d 1027, 1031 (Alaska App. 2014) (noting that the meaning of a disputed term in a plea agreement is ultimately a legal determination, after examining the reasonable expectations of the parties with respect to that term).

six drug tests unless the savings clause applied — *i.e.*, unless his therapeutic team unanimously agreed to reinstate him. But in another section, the agreement stated that "final decisions about discharge are in the Court's sole discretion." The court reasoned that, to give meaning to both provisions, it was necessary to interpret the agreement as giving the court "sole discretion" to discharge Saclamana in all cases *except* the four enumerated circumstances where mandatory discharge was required.

The superior court ruled that under the agreement, it was required to discharge Saclamana from the Wellness Court program because Saclamana missed six drug tests and his therapeutic team did not unanimously agree to reinstate him. The superior court expressed frustration at having to discharge Saclamana because it did not want to sentence Saclamana to 3 years in jail but recognized that it did not have discretion to deviate from the sentence agreed to in Saclamana's Rule 11 agreement.

On appeal, Saclamana argues that the provision giving the court "sole discretion" over final discharge decisions should prevail over the provision enumerating circumstances where the court "will" discharge Saclamana.

Saclamana argues that the agreement's structure supports his conclusion that the judge had discretion to veto his discharge. He notes that the provision giving the court "sole discretion" regarding final discharge decisions concludes the section of the agreement covering discharge from the Wellness Court program, thereby implying that the provision allowing for discretion should ultimately control.

During oral argument, the State acknowledged that the agreement was "probably not drafted by a contract attorney," but nonetheless argues that the superior court's interpretation was correct. We agree that Saclamana's plea agreement could have been drafted more carefully, and we encourage future parties to Wellness Court agreements to ensure these provisions are harmonized.

We ultimately agree, however, with the superior court's interpretation of the agreement in this case. The superior court's decision is supported by the principle that courts should reconcile conflicting terms in a contract "in a way that gives effect to

them all."[38] As the superior court noted during the evidentiary hearing, a finding that the court had sole discretion to discharge Saclamana in *all* circumstances — as opposed to only those circumstances in which the judge was expressly afforded discretion — would render the mandatory discharge language meaningless.

Moreover, the "will be discharged" section was accompanied by a savings clause, which provided that Saclamana's therapeutic team (which included the judge) had the right to review each situation "requiring discharge" from the program "on a case-by-case basis." A finding that the court retained sole discretion upon Saclamana's sixth missed drug test would similarly render the term "requiring" — and the savings clause itself — meaningless.[39] That is, the savings clause would be unnecessary if the judge alone could reinstate a participant subject to mandatory discharge.[40]

---

[38] *Mahan v. Mahan*, 347 P.3d 91, 95 (Alaska 2015) (quoting *Hussein-Scott v. Scott*, 298 P.3d 179, 182 (Alaska 2013)).

[39] In a footnote to his brief, Saclamana argues that the term "will" (in the provision enumerating circumstances that "will be" grounds for discharge) is itself ambiguous, and that it is not clear whether "will" in this context actually requires discharge from Wellness Court. But the superior court's interpretation of "will" — *i.e.*, mandating discharge — was consistent with its common meaning. "Will" is often "used to indicate requirement or command." *Will*, American Heritage Dictionary of the English Language 1982 (5th ed. 2016). The court's interpretation is further supported by the fact that the "will be discharged" section immediately followed the section enumerating circumstances in which a participant "*may*" be discharged. (Emphasis added.) That the plea agreement used "may" and "will" in such a dichotomized way necessarily suggests that "will" stands in contrast to "may." *See Cook v. Cook*, 249 P.3d 1070, 1079 (Alaska 2011) (noting that it is proper to look to "the structure of the [a]greement in interpreting the [a]greement's terms"). And as we noted, the savings clause appended to this section referred to the provision as "requiring" discharge.

[40] Although we conclude that the superior court did not have discretion to ignore the mandatory discharge language here, we note that the superior court and the prosecutor agreed that the court did have discretion to excuse a missed drug test. The superior court, however, ruled that none of Saclamana's missed drug tests — with the exception of the one that Saclamana missed when he was in custody — were excused.

The superior court's decision is also supported by the principle that specific contract provisions take precedence over general contract provisions.[41] Here, the mandatory discharge provision is a specific provision that explains that a participant will be discharged in four particular circumstances. In contrast, the provision giving the judge sole discretion over final discharge decisions is a general provision that does not distinguish between situations requiring discharge and situations authorizing, but not requiring, discharge. Given that the mandatory discharge provision is the more specific contract provision, it prevails over the general provision giving the judge sole discretion over discharge decisions.

Saclamana's primary argument is that, because the Wellness Court judge has "seen the participant's progress and demeanor throughout their participation in the program," ultimately, "it makes sense for [the judge] to exercise full discretion and consider a participant's full circumstances" before discharging the person. We acknowledge that some other jurisdictions appear to have structured their therapeutic courts to afford judges more complete discretion with respect to discharge decisions.[42]

But regardless of the policy merits of this position, Saclamana's participation in Wellness Court was governed by a plea agreement — *i.e.*, a contract

---

[41] *See Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004) ("In contracts, as in statutes, 'where one section deals with a subject in general terms and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is a conflict, the specific section will control over the general.'" (quoting *Estate of Hutchinson*, 577 P.2d 1074, 1075 (Alaska 1978))).

[42] *See, e.g.*, *State v. Belyea*, 999 A.2d 1080, 1084 (N.H. 2010) ("Individual team members recommend particular sanctions, but the ultimate decision on sanctions, including whether a participant will be terminated from the Program, rests solely with the presiding judge."); *State v. Cleary*, 882 N.W.2d 899, 902 (Minn. App. 2016) ("If there are instances [in the drug court process] where a consensus cannot be reached and a decision is required, the judge will make the final decision on the course of action to be taken."); *see also State v. Brookman*, 190 A.3d 282, 298 (Md. 2018) ("A judge who presides over a drug court program may be a 'team member,' but the judge does not relinquish the discretion conferred on judges by statute and rule to the program's sanctions menu.").

between the parties. And the Wellness Court authorizing statute, AS 28.35.028, "requires the wellness court judge to enforce the terms of a plea agreement entered into by the State and a defendant."[43] As we said in *Gou-Leonhardt v. State*, "If we interpreted AS 28.35.028(b) . . . as granting the wellness court judge the power to unilaterally alter a plea agreement that has already been accepted and executed — then the State could never be sure that it would receive the bargained-for benefits of its plea agreement with wellness court defendants."[44] Here, the judge retained final discretion about discharge in Saclamana's case, but only outside of the four circumstances demarcated in Saclamana's plea agreement as "will be discharged" provisions.

Finally, Saclamana argues that the superior court was required to construe ambiguous provisions of a plea agreement against the State because the State is the party with the greater bargaining power. But as our prior decisions indicate, and as we previously noted, a court's first task in interpreting a disputed term of a plea agreement is to apply basic principles of contract interpretation and examine relevant extrinsic evidence in order to determine if any ambiguity in the contested provision is resolved.[45]

---

[43] *Gou-Leonhardt v. State*, 323 P.3d 700, 703 (Alaska App. 2014); *see also* AS 28.35.028(b) ("If the court accepts the agreement, the court shall enforce the terms of the agreement.").

[44] *Gou-Leonhardt*, 323 P.3d at 703. We note that, under the therapeutic court model, the superior court often accepts the plea agreement months or years before the actual imposition of sentence. If the plea agreement has a fixed term for failing to complete Wellness Court — as in this case — then the judge has no discretion to factor in any successes the defendant had while in Wellness Court. That seemed to be the judge's primary concern here — that even if discharge was justified, imposition of the 3-year sentence agreed to by the parties was not warranted under the circumstances, given Saclamana's progress in other respects. This concern could potentially be addressed by the parties negotiating a sentencing range instead of a fixed term as part of the plea agreement.

[45] *See Anthony v. State*, 329 P.3d 1027, 1032 (Alaska App. 2014); *Ghosh v. State*, 400 P.3d 147, 154 (Alaska App. 2017). This analysis is similar to the analysis we undertake when construing a statutory penalty that is susceptible of more than one meaning. The rule of lenity — *i.e.*, the rule that an ambiguity in a criminal statute must be construed in the defendant's favor — "comes into play only when, after employing normal methods of

Only after the court engages in this analysis, if the meaning of the provision remains ambiguous — *i.e.*, if the parties have differing but objectively reasonable interpretations — is a court required to construe any ambiguity against the State.[46]

Here, we conclude that Saclamana's interpretation of the agreement as affording the court discretion with respect to the mandatory discharge provisions is not objectively reasonable because, as discussed above, it is not consistent with the basic principles of contract interpretation requiring that a contract be interpreted in a manner that gives effect to all terms.

For these reasons, we conclude that the superior court's interpretation of the disputed terms of Saclamana's Wellness Court agreement was correct, and that the court did not have discretion to decline to discharge Saclamana upon finding that he had missed six drug tests.

*Conclusion*

The judgment of the superior court is AFFIRMED.

---

statutory construction, the legislature's intent cannot be ascertained or remains ambiguous." *Grant v. State*, 379 P.3d 993, 995 (Alaska App. 2016) (quoting *De Nardo v. State*, 819 P.2d 903, 907 (Alaska App. 1991)).

[46] *Anthony*, 329 P.3d at 1032; *Ghosh*, 400 P.3d at 154; *see also Municipality of Anchorage v. Gentile*, 922 P.2d 248, 256 (Alaska 1996) (stating that a "presumption or inference should be used only when traditional contract principles fail").